UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| FITZGERALD TRUCK PARTS AND SALES, LLC, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:20-cv-00026 ) |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) |

# MEMORANDUM OPINION

This is yet another chapter in the continuing saga of Fitzgerald Truck Parts and Sales, LLC's alleged liability for excise tax on thousands of glider semi-trucks sold between 2012 and 2017. The Court has previously set forth the nuts and bolts of the underlying dispute as follows:

> This is a case about glider semi-trucks and, more particularly, whether excise taxes are properly imposed on the sale of those trucks. A glider truck is built from a kit. Glider kits consisting of new tractor parts, including such things as the cab, frame, sheet metal, mounting brackets and steering gear, are produced by original equipment manufacturers like Peterbilt, Kenworth, Freightliner, and Western Star. Powertrains and other necessary parts are then added and the glider trucks are offered for sale, usually at a price that is less that 75% of the cost of a new truck.
>
> Fitzgerald Truck Parts and Sales, LLC ("FTPS") is a glider kit assembler, and has been for 30 years. (Doc. No. 1, Complaint ¶ 13). FTPS's gliders "begin as worn or wrecked highway tractors, the engines and transmissions of which are capable of being repaired (i.e., rebuilt)." (Id. ¶ 18). When a glider truck is assembled and sold to a customer (usually an independent owner-operator or a small to mid-size trucking fleet), FTPS retains a copy of the previously taxed tractor's title. (Id. ¶¶ 18, 21).

Fitzgerald Truck Parts & Sales, LLC v. United States, 391 F. Supp. 3d 794, 795 (M.D. Tenn. 2019) (Fitzgerald I).

Under the Internal Revenue Code, a 12% federal excise tax is imposed "on the first retail sale" of "tractors of the kind chiefly used for highway transportation in combination with a trailer

or semitrailer." 26 U.S.C. § 4051(a)(1). The code also contains a safe harbor provision that states:

> (f) Certain repairs and modifications not treated as manufacture
>
> (1) In general
>
> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1).

Against this backdrop, Fitzgerald filed a motion for partial summary judgment in an earlier case, Docket No. 2:19-cv-00008, wherein

> Fitzgerald claimed that judicial economy would be served by deciding the threshold "question of the proper interpretation of the scope and meaning of the § 4052(f)(1) safe harbor rule as applied to its worn or wrecked repaired [sic] with glider kits." (Doc. No. 55 at 4). From its perspective, "the safe harbor rule sets forth a bright-line, purely mathematical test based on a comparison between the cost of repairs to the worn or wrecked tractor and the retail price of a comparable new tractor," as opposed to what it characterizes as the Government's "parts and pieces" test. In Fitzgerald's view, resolution of this issue would effectively decide Count One either in favor of the Government (under the parts and pieces test), or narrow the scope of discovery were a bright-line math test appropriate.

Fitzgerald Truck Parts & Sales, LLC v. United States, No. 2:19-CV-00008, 2020 WL 12893862, at *2 (M.D. Tenn. Sept. 25, 2020) (Fitzgerald II). The Court denied the motion after finding it improvidently granted. That case was then consolidated into this action and the earlier case was administratively closed. (Doc. No. 43).

Now before the Court is the Government's Revised Motion for Summary Judgment (Doc. No. 128). In it, the Government argues that Fitzgerald cannot (1) meet its burden to qualify for the safe harbor exemption; (2) prove its equitable defenses to liability; or (3) prevail on its

2

Administrative Procedures Act ("APA") challenge to IRS Notice 2017-5. The Government also argues that Fitzgerald is liable for the excise taxes on its tractors, as well as assorted penalties for not having paid them when allegedly due.

## I.

Prior to reaching the Government's argument, a bit of further background is necessary. After the Court denied Fitzgerald's Motion for Partial Summary Judgment in the earlier case, the Seventh Circuit issued an opinion in Schneider Nat'l Leasing, Inc. v. United States and decided "two questions of first impression concerning a federal excise tax on heavy trucks and the scope of a statutory safe harbor." 11 F.4th 548, 549 (7th Cir. 2021). Although Schneider is not controlling, it is a cogent and well-reasoned opinion that could hardly be more one point. Consequently, at the status conference on January 27, 2023, the Court informed the parties that it was inclined to follow that case, unless the parties showed compelling reasons for it not to do so. The Government was also granted permission to file two partial summary judgment motions, "one relating to the 75% rule under the analysis adopted by the Seventh Circuit in Schneider[,]" and the other related to the equitable estoppel and APA claims raised by Fitzgerald. (Doc. No. 108 at 1). Since then, the Court has not been provided with anything from which it could conclude that Schneider does not provide the correct framework for analysis and the Court finds that it does and will in the life of this case.

### A.

The issues of first impression addressed in Schneider both relate to the 75% rule and the safe harbor exception under Section 4052(f)(1) at issue in this case. Based upon the plain text of the statute, the Seventh Circuit found: "first, the safe harbor does not contemplate a measurement for 'repairs or modifications' apart from the 75% test Congress expressly incorporated into the statutory

3

text[.]" Id. at 544. Indeed, the language of Section 4052 allows repairs to be "extensive and substantial," and can include the use of "a glider kit – so long as the taxpayer stays within the 75% test." Id. at 556. In short, "Congress's establishment of the 75% limit as a condition for qualifying for the safe harbor means that the question whether a repair or a manufacture occurred is not answered by looking at what replacement parts—which ones or how many—were used as part of refurbishing. What marks the line between 'repairs or modifications' and 'manufacture' is the 75% cost measurement." Id. at 555.

**B.**

The court in Schneider also decided "second, the appropriate measurement for the 'retail price of a comparable new article' is the market price in ordinary, arms-length transactions." Id. at 544. As to what this means, the Seventh Circuit wrote:

> Congress did not define the "retail price of a comparable new article" in the § 4052(f)(1) safe harbor. Nor do the implementing regulations supply any definition. Regardless, Congress elected to use the term "retail price," and we "ordinarily assume, 'absent a clearly expressed legislative intention to the contrary,' that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" Jam v. Int'l Fin. Corp., —— U.S. ——, 139 S. Ct. 759, 769, 203 L.Ed.2d 53 (2019) (quoting Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982)).
>
> The plain meaning of the noun "retail" is "the sale of commodities or goods in small quantities to ultimate consumers," and the adjective form of "retail" means "of, relating to, or engaged in the sale of commodities at retail." Retail, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 999; see also Retail, BLACK'S LAW DICTIONARY 1573 (defining retail as "[t]he sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing"). We also know that the term "price" is "the amount of money given or set as consideration for the sale of a specified thing." Price, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 924; see also Price, BLACK'S LAW DICTIONARY 1439 (defining price as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold").

4

Reading the two words together, then, "retail price" reflects the amount at which an article is sold in individual, arms-length transactions to end consumers on the open market. Accord Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1480 (Fed. Cir. 1997) ("When a manufacturer sells directly to the end-user, i.e. at a retail sale, the price at which it sells is the 'retail price' as that is the price at which these items are being sold in the marketplace.").

Schneider, 11 F.4th at 559.

## II.

Although the Government has long taken the position that the 75% rule should be based upon the percentage of parts and pieces used to repair or modify, it argues here that, even under the rules announced in Schneider, summary judgment is warranted. It begins by placing heavy reliance on the expert report of Stuart MacKay for the proposition that Fitzgerald incorrectly relies on the MSRP (manufacturers suggested retail price) as the benchmark for making the 75% calculation.

In his 87-page report, MacKay explains that a survey of the trucking industry in which Fitzgerald competes shows that tractors usually sold below the MSRP, sometimes significantly so. For example, Freightliner Cascadia models that had an MSRP of $182,000 to $195,000 generally sold for somewhere around $108,000 to $112,000. (Doc. No. 129 at 12). Similarly, Peterbilt 389 models that listed for $182,000 to $212,000 actually sold for between $126,000 and $131,000. (Id.; Doc. No. 129-3, ¶¶ 89-96). MacKay further states that a prospectus prepared for Fitzgerald when it contemplated selling its business further supports the conclusion that the MSRP does not equate with the actual retail price.

Fitzgerald's own records, according to MacKay, show that its cost of repairing and modifying tractors is more than the 75% permitted by Section 4052(f). No. 192 at 11). Not only did MacKay's own review of Fitzgerald's records suggest that Fitzgerald's retail prices were in excess of 90% of the actual retail sales prices of comparable new tractors, the prospectus prepared for Fitzgerald

5

suggests as much. (Id.). For example, the prospectus contains a chart labeled "Glider Kit vs. New Truck Cost Comparison" that lists the MSRP for a "New Truck" as being $180,00, the "Sales Price" being $140,000 and the price of a "Glider" being $120,000. (Doc. No. 129-7 at 20). While 75% of $180,000 is $135,000, 75% of $140,000 is $105,000. Hence, if the actual "retail price" is the "Sales Price," as MacKay submits it should be, then Fitzgerald's selling price is 85.71% of that price.[1]

Without question, MacKay's opinions have facial appeal. Then again, so does Fitzgerald's assertion that MSRP should serve as the benchmark, if for no other reason than, by definition, it "suggest[s]" a "retail price." It also accounts for some variations that MacKay's formulation might not, including premium and additional components not found in a base model. Then again, maybe the "Truck Blue Book" mentioned in passing in Schneider should set the benchmark because, according to plaintiff's expert there, it "provides retail price information by aggregating data from actual transactions to determine the ordinary price paid by consumers in the open market." 11 F.4th at 559. Beyond referencing the "Blue Book" as a potential source, the Seventh Circuit in Schneider did not attempt to define "retail price" other than to say that the "'retail price of a comparable new article' is the market price in ordinary, arms-length transactions," to wit, "the price at which a comparable tractor could be acquired in the open market." 11 F.3th at 554, 651.

Mackay, as the Government's proferred expert, is certainly entitled to his opinions but that is not the be-all and end-all of the matter. To be sure, and as the Government points out, "the Sixth Circuit allows an expert report at summary judgment as long as it is more than 'a conclusory assertion about ultimate legal issues' and meet the standards of Fed. R. Civ. P. 56 and Fed. R. Evid.

---

[1] Obviously, there must be some accounting for profit, but for the sake of this argument the Court will assume that, all things being equal, profits of roughly the same amount were calculated into both the "Sales Price" and the "Glider" price.

6

702." (Doc. No. 134 at 1 (quoting Brainard v. Am. Skandia Life Assurance Corp., 432 F..3d 655, 663 (6th Cir. 2005)). But, Brainard does not hold or even intimate that an expert opinion is to be given determinative weight, or that an expert opinion can usurp the jury's fact finding role. Quite the contrary, the Sixth Circuit in Brainard upheld the trial court's decision to discount an expert's testimony when ruling on summary judgment. This is hardly surprising because the "credibility of an expert witness and the weight to give h[is] testimony are matters entrusted to the trier of fact." Burgett v. Troy-Bilt LLC, 579 F. App'x 372, 381 (6th Cir. 2014). Even though the Supreme Court in Daubert v. Merrell Dow Pharms., Inc. placed a gatekeeping role on trial judges under Rule 702, it did not supplant the adversary role of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 579, 596 (1993). The same holds true for "shaky" lay testimony that Fitzgerald may seek to introduce through its corporate representatives.

The Government's second argument under the safe harbor provision fails as well. The statute provides that the safe harbor will "not apply if the article (as repaired or modified) would, if new, be taxable under section 4051 and the article when new was not taxable under such section or the corresponding provision of prior law[.]" 26 U.S.C. § 4052(f)(2). Based on this language, the Government argues that summary judgment is warranted because Fitzgerald cannot show that the "'repaired tractor,' when new, was taxable." (Doc. No. 129 at 13). The Government notes that tractors exported out of the United States are not taxed, nor are excise taxes paid on tractors initially purchased by local government, nonprofit educational organizations, or qualified blood collectors. (Id. at 14). It then argues that "plaintiff cannot trace the remanufactured transmissions and rear axles

7

installed," and "none of plaintiff's records demonstrate that the repaired tractor, when new was taxable." (Id.).

At this point, the Court finds it appropriate to pause and take a step back to consider what will be tried this summer. Even leaving aside whatever the size the universe comprising exported/local government/nonprofit and blood collector tractors is, certainly the Government cannot be seriously claiming that, to prevail, Fitzgerald will need to prove that each and every one of the thousands of tractors it repaired was taxed when new. Even a lifetime appointment would probably not allow for that to happen. Fortunately, that is not what the statute demands.

The statute requires that the tractor be "taxable," not that it was "taxed." Specifically, it requires that the article "would be, if new taxable" but "when new was not taxable." 26 U.S.C. § 4052(f). Had Congress meant taxed as opposed to taxable, it could and should have said so. See Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 409 (1993) (citation omitted) ("The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'"). "Taxable" means "subject to being taxed: making one liable to taxation." https://www.merriam-webster.com/legal/taxable; accord Am. Bankers Ins. Co. of Fla. v. United States, 265 F. Supp. 67, 73 (S.D. Fla. 1967).

How is "the article" subject to being taxed? The statute says it must "be taxable under section 4051 . . . or the corresponding provision of prior law[.]" 26 U.S.C. § 4052(f)(2). Section 4051, in turn, imposes a 12% excise tax on a number of articles, including "[t]ractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer," so long as it weighs more than 33,000 pounds. 26 U.S.C. § 4051(a)(1), (2). The exported/local government/nonprofit and blood collector exceptions on which the Government relies are found in

8

an entirely different section of the tax code, specifically Section 4221(a).

In response to the Government's Motion for Summary Judgment, Fitzgerald has submitted declarations from Tommy Fitzgerald, a partner in the family owned business, and from Nick Bresaw, a former Vice President of the company. Both declare that it was their understanding that the engines Fitzgerald used in its glider kits were extracted from worn or wrecked tractors that they understood were taxable, and that its business records would confirm as much. (Doc. Nos. 131-2, -3). Obviously, these statements are conclusory and cross-examination at trial will be robust. On the other hand, there is nothing before the Court that suggests that the worn or wrecked tractors from which the engines came would not have been taxable. In any event, Fitzgerald is seeking to enforce a subpoena in the Eastern District of Michigan requiring Detroit Diesel to produce engine records that would presumably show that the original tractors into which the engines were installed would have been taxable. (Doc. No. 131-14, Kendall C. Jones Decl. ¶ 7). So, it appears, that the tax-paying jurors will have evidence to make a decision.

The Government's Motion for summary judgment on Fitzgerald's safe harbor claims will be denied.

### III.

Next, the Government seeks summary judgment on Fitzgerald's equitable estoppel claim. There, Fitzgerald alleges that, even if it owes excise taxes, it should be relieved of liability because of the Government's vacillating positions over time.

It appears undisputed that the IRS previously audited dozens of Fitzgerald's quarterly returns and found that the safe harbor applied to its glider kit in accordance with Revenue Ruling 91-27. According to Tommy Fitzgerald:

9

> 43. The IRS conducted excise tax audits for all four quarters for 1996, 1997, 2005, 2006, 2007, 2008, 2009, 2010, and the first quarter of 2011, and it was ultimately determined that Fitzgerald's sales of glider tractors met the section 4052(f) safe harbor requirements.
>
> 44. In none of the audits prior to the years in issue did the IRS tell Fitzgerald that its books and records did not substantiate compliance with the safe harbor statute.
>
> 45. In no audits did the IRS ever inform Fitzgerald that its business records were incomplete or inaccurate.
>
> 46. In no audits did the IRS ever inform Fitzgerald that the worn or wrecked tractors from which engines were extracted would not have been taxable, if new, and in all audits the IRS never determined that any of the worn or wrecked tractors would not have been taxable.
>
> 47. In no audits did the IRS ever inform Fitzgerald that it must have title to the worn or wrecked tractors, and in all audits the IRS never determined that title or ownership of the worn or wrecked tractors was required.

(Doc. No. 131-2, Fitzgerald Decl. ¶¶ 43-47). Joseph DePew, who was Fitzgerald's general counsel from early 2017 through 2021, and who represented Fitzgerald before the IRS from 2005 through 2017, also states "that the IRS agreed that the safe harbor applied for 2006 to 2008 and 2008 to 2011, with the exception of taxes owed on a few dump trucks." (Doc. No. 131-4, Depew Decl. ¶ 48).

Sometime in the 2013 to 2014 time-frame, however, the IRS apparently began backing away from Revenue Ruling 91-17. There followed a hiatus in glider truck industry audits, as well as a cessation of private letter rulings on the application of the safe harbor to glider tractor sales. (See id. ¶¶ 9-10). Then came IRS Notice 2017-5 that "provide[d] interim definitions of the terms 'chassis' and 'body' for purposes of § 4051(a)(1) and for purposes of applying the safe harbor provision in § 4052(f)(1)." Interim Guidance, 2017-5 I.R.B. 779 (2017). Among other things, the Notice provided that the safe harbor provision only applies to a § 4051(a)(1) article that "has been previously taxed" (id.), instead of the words selected by Congress of being simply taxable.

10

This is not the first time the Court has addressed equitable estoppel in this case. In the context of the Government's motion to dismiss before the two cases were consolidated, the Court noted that, while a litigant has a tough row to hoe in attempting to estop the Government, Fitzgerald stated a plausible claim. Now that the matter is being reviewed on summary judgment, the Court is convinced that the question of equitable estoppel is for the jury because the core facts supporting it have not changed.

In its earlier ruling, the Court set out the law governing equitable estoppel against the Government:

> "'Estoppel is an equitable doctrine which a court may invoke to avoid injustice in particular cases.'" Michigan Exp., Inc. v. United States, 374 F.3d 424, 427 (6th Cir. 2004) (quoting Fisher v. Peters, 249 F.3d 433, 444 (6th Cir. 2001)). " '[T]he traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel.' " Id. (quoting LaBonte v. United States, 233 F.3d 1049, 1053 (7th Cir. 2000)). Because, as [the Supreme Court] confirmed, the government may not be estopped on the same terms as other litigants, " '[a] party attempting to estop the government bears a 'very heavy burden' in sustaining its argument.'" Id. (quoting Fisher, 249 F.3d at 444). "At a minimum, the party must demonstrate some 'affirmative misconduct' by the government," which is "more than mere negligence" and requires an intentional act "that either intentionally or recklessly misleads the claimant." Id.

Fitzgerald I, 391 F. Supp. at 799. Fitzgerald has more than demonstrated the minimum evidence for a jury to determine whether it was intentionally or recklessly misled by the Government.

In its opening brief, the Government spends pages trying to explain why, "on closer inspection," Fitzgerald could not rely on "the substance or outcomes" for "exams for 1996-1997, 2005-2006, and 2008-2011" to support "an exemption from tax in 2012-2017." (Doc. No. 129 at 16). All things being equal, why couldn't a jury find that Fitzgerald relied on those audits? After all, a jury could reasonably conclude that it's a bit much to ask a taxpayer to revisit an issue when

11

it has repeatedly been given the thumbs-up audit after audit, after audit.

Attempting to avoid a jury deciding the question, the Government submits there are many reasons why Fitzgerald should not have relied on the earlier audits. For example, the Government states the entity audited in 1996 and 1997 was not the same as that audited in later years. (Doc. No. 129 at 16). Maybe so, but Fitzgerald asserts the change was simply the result of an administrative dissolution by the State of Tennessee with a new but substantially similar entity immediately replacing it. (Doc. No. 131 at 5).

The Government also generally complains that Fitzgerald has not shown that its business year-in and year-out was the same and therefore reliance on earlier rulings is misplaced. It also complains that "[e]ither plaintiff made a misrepresentation to influence the outcome of the earlier audits or the facts materially changed between the earlier audits and the years at issue in the suit." (Doc No. 129 at 21). However, whether Fitzgerald or the Government lied then, is lying now, or not at all is quintessentially a jury factual question.

The Government further argues that "[n]ot only did plaintiff decline to seek a private letter ruling," Fitzgerald "made a conscious choice not to seek a ruling because it was concerned it would have to live with an unfavorable determination." (Id. at 20). The last half of that argument about Fitzgerald being concerned is an argument for the jury, and the first half ignores DePew's declaration that he was informed by IRS counsel that no revenue rulings were being issued by the IRS on the subject of glider kits. (Doc. No. 131-3, DePew Decl. ¶¶ 7-10).

"Equitable estoppel is a mixed question of law and fact and must be submitted to the jury when an evidentiary dispute exists regarding its application." Berhad v. Advanced Polymer Coatings, Inc., 652 F. App'x 316, 325 (6th Cir. 2016); see also, Kosakow v. New Rochelle

12

Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001) (stating under federal law that "[w]hether equitable estoppel applies in a given case is ultimately a question of fact"). In other words, "[w]here an allegation of estoppel raises factual questions on which reasonable minds might disagree, the questions must be resolved at trial by the trier of fact," but "where the facts are not in dispute or are beyond dispute, the existence of estoppel is a question of law." J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co., 936 F.2d 1474, 1493 (6th Cir. 1991) (internal citations omitted). A fact-driven jury question exists on the application of equitable estoppel.[2]

## IV.

Next, the Government moves for summary judgment on Fitzgerald's APA claims. "The APA allows judicial review for persons 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action,' and defines 'agency'" as "'each authority of the Government of the United States[.]'" Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater, 173 F.3d 1033, 1035 (6th Cir. 1999) (quoting 5 U.S.C. §§ 701(b)(1), 702).

Fitzgerald first alleges that it was harmed when the IRS issued Notice 2017-5, "where for the very first time the IRS informed taxpayers that certain specified components must be retained from a worn or wrecked highway tractor in order for the § 4052(f)(1) safe harbor provision to apply when repairing the tractor." (Doc. No. 36, Am. Cmpl. ¶ 138). It claims "[t]he rule set forth in Notice 2017-5 effectively prevents application of the safe harbor rule to worn or wrecked tractors that are rebuilt using glider kits despite the fact that § 4052(f)(1) specifically provides that wrecked tractors may be repaired without triggering the excise tax as long as the safe harbor bright-line math test is

---

[2] To the extent that equitable estoppel is more properly a question for the Court, Rule 39 provides that "in an action not triable of right by a jury, the court, on motion or on its own: (1) may try any issue with an advisory jury[.]" Fed. R. Civ. P. 39(c)(1).

met, regardless of what parts or pieces of the tractor are retained." (Id. ¶ 156). Fitzgerald also contends "[t]he new rule announced in Notice 2017-5, without explanation, treats similarly situated taxpayers differently depending on what parts and pieces were retained from the original highway tractor, discriminating against taxpayers like FTPS who, in reliance on Rev. Rul. 91-27, Rev. Rul. 63-210 and the clear language of § 4052(f)(1), used glider kits to repair worn or wrecked tractors." (Id. ¶ 171).

Ordinarily, the APA requires an agency to provide notice of proposed rulemaking and a period of public comment before the promulgation of a new regulation. 5 U.S.C. § 553. However, the APA specifically provides that the notice and comment requirements do not apply:

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

Id. § (b).

"The distinction between rules or statements which are subject to the notice and comment requirements of § 553 and rules or statements which are exempt from those procedures is notoriously "hazy," Orengo Caraballo v. Reich, 11 F.3d 186, 194–95 (D.C. Cir. 1993), if not "enshrouded in considerable smog," Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.1975). Indeed, in Perez v. Mortg. Bankers Ass'n, the Supreme Court noted that "[t]he term 'interpretative rule,' or 'interpretive rule,' is not further defined by the APA, and its precise meaning is the source of much scholarly and judicial debate." 575 U.S. 92, 97 (2015). Choosing not to "wade into that debate" the Supreme Court in Perez nevertheless noted that "it suffices to say that the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes

14

and rules which it administers.'" Id. (quoting Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99 (1995). "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" Id.

"As Perez makes clear, the APA 'permit[s] agencies to promulgate freely [interpretive] rules—whether or not they are consistent with earlier interpretations" of the agency's regulations. Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting Perez, 572 U.S. at 103). "Such agency interpretations and policy statements do not 'amend' the regulations to which they refer [because as] noted in Perez, '[o]ne would not normally say that a court 'amends' a statute when it interprets its text. So too can an agency 'interpret' a regulation without 'effectively amend[ing]' the underlying source of law." Id. Simply put, "the Court [in Perez] held that the APA does not require an agency to provide notice and comment in amending an interpretive rule, even if the new rule deviates significantly from its predecessor." California Communities Against Toxics v. Env't Prot. Agency, 934 F.3d 627, 635 (D.C. Cir. 2019)

Even though, "[s]omewhere along a spectrum, a rule transitions from being interpretive to being legislative," New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018), Notice 2017-5 does not make that transition. Published on February 6, 2017, the Notice is titled "Interim Guidance and Request for Comments on Definitions of Chassis and Body; Retail Excise Tax on Heavy Trucks, Repairs, Trailers, and Tractors." Notice 2017-5 (ITS NOT), 2017-6 I.R.B. 779, 2017 WL 189911. True to its title, it purports to define "chassis" and "body" for purposes of Section 4051 and the safe harbor provision under Section 4052. It also provided for a period of notice and

15

comment, which apparently has since closed. Nowhere does it impose any consequence on a taxpayer that chooses not to follow it, nor does it impose an obligation on the taxpayer.[3] Instead, it states the IRS's opinion. Indeed, the Government asserts it is not relying on Notice 2017-5 in this case. (Doc. No. 129 at 27).

At best, Fitzgerald's APA complaint may be premature. "A 'complaint under the APA for review of an agency action is a civil action within the meaning of 28 U.S.C. § 2401(a) . . . governed by a six-year statute of limitations . . . [that] begins to run from the time of 'final agency action.'" Friends of Tims Ford v. Tennessee Valley Auth., 585 F.3d 955, 964 (6th Cir. 2009) (internal citations omitted). "In determining what constitutes final agency action, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" Id. Here, and regardless of what the Government may say about not relying on Notice 2017-5, a jury will decided whether the glider kits manufactured by Fitzgerald during the relevant period met the safe harbor provision of the statute, not whether it met any notice that the IRS may have developed since then.

## V.

Finally, the Government argues that Fitzgerald is liable for penalties for failing to: timely file quarterly returns; pay taxes due; and submit accurate returns. These arguments go beyond what was allowed when the Court granted the Government leave to file a partial motion for summary judgment on specific topics. Regardless, the motion is subject to denial because a jury question exists on whether Fitzgerald was liable for paying the excise tax in the first place.

---

[3] To the extent Fitzgerald argues that it is required by Notice 2017 to keeps the parts and pieces it replaces, the Court does not find that directly mandated by the Notice with some sort of penalty for failure to retain the parts. Besides, under Schneider the parts and pieces test is not the correct test that will be applied by the jury.

## VI.

When denying Fitzgerald's Motion for Partial Summary Judgment more than 2½ years ago, the Court observed that sometimes it is best to settle a case "when the winds of uncertain[ty] swirl about" and it is even more prudent when the wind "may actually be howling." Fitzgerald II, 2020 WL 12893862 at *3. The swirling and howling winds, apparently, fell on deaf ears. Now, with the Government's motion for summary judgment denied in most respects, the Court could observe that sustained gale-force winds are a'blowin. It refrains from making that observation because it has given up on the wind/settlement metaphor and the parties' ability to exercise the common sense and good judgment necessary to settle their dispute. Instead, the Court accepts as a given that the hurricane will make landfall at 9:00 a.m. in Cookeville, Tennessee when jury selections begin.

On the basis of the foregoing, an appropriate Order will be entered denying the Government's Motion for Partial Summary Judgment, except with respect to Fitzgerald's APA claims.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE