**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **FITZGERALD TRUCK PARTS AND SALES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00026 |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

After a trial held in Cookeville, Tennessee between July 10 and July 14, 2023, a jury found that Fitzgerald Truck Parts and Sales, LLC ("Fitzgerald") was not liable for excise tax on some 12,830 glider semi trucks sold between 2012 and 2017. The Government has now filed a Motion for Judgment as a Matter of Law or New Trial (Doc. No. 198), to which Fitzgerald has filed a response in opposition (Doc. No. 212) and the Government has replied (Doc. No. 216). Also before the Court is the Government's fully briefed Motion to Redact (Doc. Nos. 195, 196, 201). For the reasons that follow, both Motions will be denied. First, however, a bit of background will help place the parties' arguments in context.

### I.  Background

On two prior occasions, the Court has discussed the facts underlying the parties dispute: Fitzgerald Truck Parts & Sales, LLC v. United States, ("Fitzgerald II"), No. 2:20-CV-00026, ___ F. Supp. 3d ___, 2023 WL 3195470 (M.D. Tenn. May 2, 2023); Fitzgerald Truck Parts & Sales, LLC v. United States, (Fitzgerald I"), 391 F. Supp. 3d 794 (M.D. Tenn. 2019). In a nutshell, those facts

1

are as follows:

For more than 30 years, and up until Environmental Protection Agency ("EPA") regulations essentially abolished the market, Fitzgerald manufactured glider semi-trucks. It did so by placing rebuilt engines and transmissions from wrecked highway tractors into glider kits produced by original equipment manufacturers. The kits from those manufacturers generally included such things as the cab, frame, sheet metal, mounting brackets and steering gear, to which the rebuilt powertrains were then added. Through this method, the goal was to offer for sale essentially a new truck – albeit with a rebuilt engine and transmission – at a lower price than a comparable truck from the factory. Not only did the customer receive a reduction in price, the customer was also not on the hook for excise taxes, at least if the governing regulations were followed. Herein lies the core of the parties' dispute.

Under the Internal Revenue Code, a 12% federal excise tax is imposed "on the first retail sale" of "tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer." 26 U.S.C. § 4051(a)(1). The code also contains a safe harbor provision that states:

(f) Certain repairs and modifications not treated as manufacture

> (1) In general
> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1).

It has been Fitzgerald's position throughout that the trucks it produced met the safe harbor

2

provision. The Internal Revenue Service ("IRS") disagrees. In accordance with IRS regulations, Fitzgerald paid the excise tax on one truck for each quarter of the tax years at issue, meaning excise taxes were not paid on some 12,800-plus gliders. The stakes are enormous, especially for a company that is no longer producing trucks, and never collected the excise tax from the purchaser in the first place. Those taxes are more than ten million dollars. Penalties and interest place that figure in the neighborhood of $300 million.

At the conclusion of the bifurcated trial,[1] the jury was called upon to answer three questions. First, the jury was asked, "[d]id Fitzgerald Truck Parts and Sales, LLC prove that the cost of repair of the glider tractors it assembled and sold during the years 2012 through 2017 did not exceed 75% of the retail price of a comparable new highway tractor?" (Doc. No. 191 at 1). Second, the jury was asked, "[d]id Fitzgerald prove that the original highway tractor was taxable when it was new?" (Id.). The jury answered both of those questions in the affirmative. Third, the jury answered "all" when asked, "[h]ow many of the glider tractors did Fitzgerald prove met all the requirements for the Safe Harbor Exemption Provision?" (Id.). Judgment was thereafter entered on that verdict. (Doc. No. 194).

## II. Motion to Redact

In a first for the Court, the Government accuses the Court of acting libelously in its Daubert[2] ruling in relation to the Government's proposed expert Dr. Yingzhen Li. It seeks to redact two pages of the transcript of the Daubert hearing wherein the Court discusses Dr. Li's insipid testimony and

---

[1] The second phase of the trial – which became unnecessary given the jury's verdict – would have dealt with the issue of whether the Government should be collaterally stopped from collecting taxes because of its repeated findings that Fitzgerald allegedly met the safe harbor provision.

[2] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

3

suggests that he reached a foregone conclusion based upon what the Government told him. In other words, Dr. Li was a hired gun. The bulk of the Government's brief, however, both in support and in reply on its Motion to Redact, focuses on whether the Court reached the correct conclusion in not permitting Dr. Li to testify. Perhaps this is because the Government has no legal basis to request the transcript be redacted.

Leaving aside the general proposition that statements in judicial proceedings, if relevant to the issues involved, are absolutely privileged, see, Gen. Elec. Co. v. Sargent & Lundy, 916 F.2d 1119, 1126 (6th Cir. 1990), there is a "presumption of openness" to court proceedings, Press-Enter. Co. v. Superior Ct. of Cal., 464 U.S. 501, 510 (1984). The same is true for the records of those proceedings. See Cox Broad. Corp. v. Cohn, 420 U.S. 469, 492-93 (1975). As Justice William O. Douglas once observed:

> "A trial [or hearing] is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

Id. (quoting Craig v. Harney, 331 U.S. 367, 374 (1947)).

Because of "the strong presumption in favor of openness," Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1179 (6th Cir. 1983), "[o]nly the most compelling reasons can justify non-disclosure of judicial records, In re Knoxville News-Sentinel Co., Inc., 723 F.2d 470, 476 (6th Cir. 1983). "The burden" to restrict access "is a heavy one." Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan, 825 F.3d 299, 305 (6th Cir. 2016); accord, Mitchell v. Tennessee, No.

3:17-CV-00973, 2020 WL 6712169, at *2 (M.D. Tenn. Nov. 16, 2020). That burden may be even greater where, as here, a party seeks to redact a court's ruling or opinion because "the public is entitled to assess for itself the merits of judicial decisions." Id.; see also Moroughan v. Cnty. of Suffolk, No. 12CV0512JFBAKT, 2021 WL 280053, at *2 (E.D.N.Y. Jan. 24, 2021) ("[T]he weight given to that presumption of access for judicial opinions is extremely strong.); Adler v. Ingle, No. 1:20-CV-00048 (TNM), 2020 WL 7682392, at *1 (D.D.C. Oct 29, 2020) (citation omitted) ("The presumption of full disclosure is 'especially strong for judicial orders and opinions.'").

The Government has not come close to meeting its burden. The most the Court can glean from its arguments is that it did not like this Court's ruling and that the insinuation that Dr. Li and the Government were in cahoots in formulating Dr. Li's opinion is simply wrong. However, disagreeing with a ruling is hardly a basis for redaction. Further, "a litigant's 'natural desire' to safeguard its reputation against potentially prejudicial information 'cannot be accommodated by courts without seriously undermining the tradition of an open judicial system.'" Nat'l Credit Union Admin. Bd. v. Lucic, No. 1:14-CV-254, 2015 WL 1738054, at *2 (N.D. Ohio Apr. 16, 2015) (quoting Brown & Williamson 710 F.2d at 1179-80); see also Kiwewa v. Postmaster Gen. of United States, No. 18-3807, 2019 WL 4122013, at *2 (6th Cir. Mar. 26, 2019) ("Harm to reputation is insufficient to overcome the strong presumption in favor of public access[.]").

The Government's Motion to Redact will accordingly be denied.

### III.  Motion for Judgment as a Matter of Law or New Trial

The Government takes a shotgun approach in moving for judgment as a matter of law or a new trial. Even so, its arguments fall into six camps, identified by the Government as follows: (1) Plaintiff failed to meet its burden to produce legally sufficient evidence from which a jury could find

5

that it met the safe harbor in 26 U.S.C. § 4052(f); (2) the evidence established that Plaintiff was buying parts, but the safe harbor requires repair of an article; (3) the Court improperly excluded Dr. Li's testimony; (4) the Court abused its discretion in limiting Mr. Stuart MacKay's testimony; (5) comments by Plaintiff's trial counsel and witnesses and exhibits about prior audits were irrelevant and highly prejudicial because of the Court's order to bifurcate the trial; and (6) the Court improperly excluded certain exhibits. Each of those arguments will be considered in turn after a review of the standards governing a request for judgment or a new trial.

## A. Standard of Review

### 1. Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure allows a party to renew a previously denied motion for judgment as a matter of law within 28 days of the entry of judgment following trial. Fed. R. Civ. P. 50(b). Such a renewed motion may only proffer arguments that were advanced in the pre-verdict motion. Ford v. Cty. of Grand Traverse, 535 F.3d 483, 491-92 (6th Cir. 2008).

A motion for judgment as a matter of law may be granted only if, "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." Rhinehimer v. U.S. Bancorp Invs., Inc., 787 F.3d 797, 804 (6th Cir. 2015) (quoting Barnes v. City of Cincinnati, 401 F.3d 729, 736 (6th Cir. 2005)). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of [the] court should not be substituted for that of the jury." Id. (quoting Balsley v. LFP, Inc., 691 F.3d 747, 757 (6th Cir. 2012)). "In other words, the decision to grant judgment as a matter of law . . . is appropriate whenever there is a complete absence of

6

pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." Jackson v. FedEx Corp. Servs., 518 F.3d 388, 392 (6th Cir. 2008) (citation omitted). Under Rule 50(b), the Court may allow the verdict to stand, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

### 2. Motion for a New Trial

Rule 59 provides in part that "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." E.E.O.C. v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation marks and citations omitted).

### B. Sufficiency of the Evidence

"The Internal Revenue Code specifies that . . . [a] taxpayer must comply with the tax refund scheme established in the code before bringing suit 'seeking a refund of taxes erroneously or unlawfully assessed.'" United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008) (citation omitted). Once suit is brought, "[t]he taxpayer must prove its entitlement to a tax refund by a preponderance of the evidence." Sherwin-Williams Co. v. United States, 403 F.3d 793, 796 (6th Cir. 2005) (collecting cases).

It is true, as the Government is quick to point out, that "'[t]he presumption is that taxes paid are rightly collected upon assessments correctly made by the [IRS], and in a suit to recover them the

7

burden rests upon the taxpayer to prove all the facts necessary to establish the illegality of the collection.'" Id. (quoting Niles Bement Pond Co. v. United States, 281 U.S. 357, 361 (1930)).  It does not follow, as the Government seems to believe however, that, to prevail, Fitzgerald needed documentary evidence in the form of a title to each of the 12,800+ wrecked trucks that it allegedly repaired.  Nor is it true, as the Government argues, that "the self-serving testimony of Plaintiff's witnesses . . . is insufficient, *as a matter of law,* to meet Plaintiff's burden of proof." (Doc. No. 198-1) (emphasis in original).

Self-serving testimony is hardly novel.  Many times it is the norm.  Otherwise one would likely forego calling that witness.  See, Ledbetter v. Good Samaritan Ministries, 777 F.3d 955, 958 (7th Cir. 2015) ("[M]ost testimony by a party to a lawsuit is self-serving and is not to be rejected on that account."); Salekin v. McDonough, No. 3:21-CV-00107, 2023 WL 5538981, at *1 (M.D. Tenn. Aug. 28, 2023) ("[T]here would be little point in filing an affidavit or declaration if it was not self-serving, at least to an extent.").  "[O]nly when testimony spins a 'visible fiction . . . so utterly discredited by the record that no reasonable jury would have believed it' will Plaintiff's testimony be set aside and ignored."  Corpus v. Aim Leasing Co., No. 3:19 CV 2250, 2021 WL 3737911, at *9 (N.D. Ohio Aug. 24, 2021) (quoting United States v. Hughes, 606 F.3d 311, 319 (6th Cir. 2010)).  Beyond that, and assuming the witnesses are testifying based upon personal knowledge, it is for the jury to assess their credibility,  including their biases and allegiances, not the Court, and certainly not the Government.  Taxpayer actions are no different.  See, Lewis v. United States, 336 F. App'x 535, 538 (6th Cir. 2009) ("[T]he Government claims, the normal rules of summary judgment somehow do not apply to tax cases, and 'the uncorroborated oral testimony of the taxpayer is insufficient as a matter of law to overcome summary judgment.' The cases that the Government cites

8

do not, however, support such a position."); United States v. Stein, 881 F.3d 853, 856 (11th Cir. 2018) (overruling circuit precedent "to the extent it holds or suggests that self-serving and uncorroborated statements in a taxpayer's affidavit cannot create an issue of material fact with respect to the correctness of the government's assessments").

In an ideal world, perhaps, Fitzgerald would have been able to produce titles for each of the tractors that had been scrapped. However, such a world would not take into account the unrefuted testimony that, at least in some states, it is unlawful to transfer titles for such tractors.[3] Even Andrew Waite, a salvage yard operator called by the Government testified to that effect. (Doc. No. 207 at 82 (A. Aaron). And it would ignore that, contrary to some tax laws that require taxpayers to maintain records, Section 4052(f) does not require producing or keeping specific records. Indeed, Fitzgerald argues – and the Government does not dispute – that "[t]he IRS has never issued any guidance telling taxpayers to keep certain records for the safe harbor[.]" (Doc. No. 212 at 4).

Next, the Government argues that the "record contains insufficient evidence that Plaintiff satisfied the Safe Harbor for 2012-2014," and "contain no evidence for the tractors sold between 2015-2017." (Doc. No. 198-1 at 5, 6). The Government continues:

> The cost of repair includes all of the costs to get the highway tractor ready for sale to an individual purchaser, other than federal, state, or local taxes [sic]. A "comparable new" highway tractor is a highway tractor which is functionally identical to the repaired highway tractor and is new. "Retail price," according to the Seventh Circuit opinion, which the Court repeatedly said it was going to follow, is the price at which a new highway tractor is sold directly to the consumer or end-user, usually an individual purchaser or small business, in the open market from a dealer ready for use. In other words, the price is what the end use of the product pays.

(Id. at 5).

---

[3] In some states, the titles must remain at the salvage yard or wherever the carcass of the vehicle is located. In lieu of a title, Fitzgerald maintained bills of sale for the tractors and engines it purchased.

9

The Government submits that because there was no evidence for years 2015-2017 and insufficient evidence for the years 2012-2014 as to the cost repairs performed *vis-a-vis* the cost of a new tractor, it is entitled to judgment or a new trial. The Government also asserts that it is entitled to the same relief because no evidence shows for the years in question that "the original tractor was not sold to a state or municipal government, exported out of the United States for sale, or not sold to a tax-exempt organization." (Id. at 7).

The Seventh Circuit decision referenced by the Government is Schneider Nat'l Leasing, Inc. v. United States, 11 F.4th 548 (7th Cir. 2021) wherein the court decided "two questions of first impression" concerning the 75% rule and the safe harbor exception under Section 4052(f)(1). Based upon the plain text of the statute, the Seventh Circuit held: "first, the safe harbor does not contemplate a measurement for 'repairs or modifications' apart from the 75% test Congress expressly incorporated into the statutory text; and second, the appropriate measurement for the 'retail price of a comparable new article' is the market price in ordinary, arms-length transactions." Id. at 554.

Even though a Seventh Circuit decision is not controlling, the parties were informed long before trial this Court found Schneider to be "a cogent and well-reasoned opinion" and that, "unless the parties showed compelling reasons" for not following Schneider, that decision would provide the "correct framework for analysis" going forward. Fitzgerald II, 2023 WL 3195470, at *2.[4] No

---

[4] In that same opinion, the parties were forewarned about how the Court viewed the presentation of proof:

The Court finds it appropriate to pause and take a step back to consider what will be tried this summer. Even leaving aside whatever the size the universe comprising exported/local government/nonprofit and blood collector tractors is, certainly the Government cannot be seriously claiming that, to prevail, Fitzgerald will need to prove that each and every one of the thousands of tractors it repaired was taxed when new. Even a lifetime appointment

10

such reasons were provided by either party.

Contrary to the Government's apparent belief, evidence consists of more than just documents. Rather, evidence consists of witness testimony, exhibits allowed into evidence, the parties stipulations and facts judicially notice. See 6th Circ. Pattern Jury Inst. § 1.04. Based upon *all* of the evidence presented at trial, and giving Fitzgerald "the benefit of all reasonable inferences," Rhinehimer, 787 F.3d at 804, the Court cannot conclude that the jury got it wrong when it found, more likely than not, that Fitzgerald proved that (1) "the cost of the repair or modification to the highway tractor did not exceed 75 percent of the retail price of a comparable tractor"; and (2) "the highway tractor, when new, was taxable," as required by this Court's Jury Instruction to which the Government did not object. (Doc. No. 192 at 36).

At trial, the testimony of three individuals provided the bulk of Fitzgerald's case regarding its business: Tommy Fitzgerald, its owner; Nick Bresaw who served as Vice President of Operations, and Joe Depew, who was in-house counsel. Their testimony was consistent, straight forward, and showed that Fitzgerald had a pretty simple business model.

First, Fitzgerald would find a worn or wrecked tractor, or purchase the same from assorted sources, such as Koch Parts, salvage yards, and auction houses. Fitzgerald would then use an acetylene torch to cut out the engine, snip the attached wires and hoses, and rebuild the engine. If the transmission was salvageable, that would be cut out as well, and sent to a facility such as Eaton

---

would probably not allow for that to happen. Fortunately, that is not what the statute demands.
Id. at *4.

transmissions for rebuilding.[5] All of the purchased engines were Class 8 engines,[6] meaning they could pull a gross vehicle weight of up to 80,000 pounds, *i.e.* they came from a highway tractor. (See e.g., Doc. No. 205 at 142,145, 151 (T. Fitzgerald); Doc. No. 206 at 31 (T. Fitzgerald), 52-54, 63-64 (Bresaw); 173, 201, 228 (DePew)).

Next, Fitzgerald would use a glider kit from a major truck manufacturer such as Peterbilt, Kenworth, or Western Star. The rebuilt engine (and sometimes transmission to which it was "married") would then be placed into the kit, thereby producing a glider tractor. If things went as planned, Fitzgerald would be able to sell the glider tractor for an average of $8,000 profit on each unit, and the customer would be able to buy a glider tractor for far less than 75% price of a new tractor. (See e.g., Doc. No. 205 at 148-49 (T. Fitzgerald); Doc. No. 206 at 55, 56, 73, 106-07 (Bresaw)).

The testimony was also consistent as to pricing. Fitzgerald generally built top-of-the-line tractors, usually with sleeper cabs. Fitzgerald's looked at the Manufacturer's Suggested Retail Price ("MSRP") for a new tractor from truck companies such as Peterbilt or Kenworth that included the accessories found in Fitzgerald's newly minted, rebuilt tractor with the same bells and whistles. (See e.g., Doc. No. 205 at 169, 171 (T. Fitzgerald); Doc. No. 206 at 89-90 (Bresaw);

Self-serving though it may have been, the jury was not left with just this testimony. Not only was the testimony subjected to the crucible of cross examination, Fitzgerald produced a lengthy

---

[5] Initially, Fitzgerald would receive the entire wrecked tractor in order to extract the engine. Later, it reduced costs by having the salvage yard or auction house cut out the engine (and perhaps transmission) and just ship that, leaving the seller to scrap the remainder for whatever it could get.

[6] The vast majority of Class 8 engines that Fitzgerald used were the 60 Series manufactured by Detroit Diesel. Detroit Diesel or not, the pedigree of the engine was determined on site by Clarke Diesel.

12

spreadsheet for 2012 to 2014 setting forth it sales price compared with its cost of repairs. That spreadsheet, for example, showed that on January 11, 2012, Fitzgerald sold a Freightliner Columbia for $110,500 that, if new, would have cost $173,727, meaning the cost of the glider was 61% of a new tractor. (Def. Ex. 340 at 1). Similarly, on April 16, 2014, Fitzgerald sold a 2014 Peterbilt 389 Day Cab for $129,010, which is 58% of a new one that had an MSRP of $221,968. (Id. at 92). Overall, the spreadsheet suggested that Fitzgerald generally sold its trucks during this period at somewhere around 50-68% of a comparable new tractor.

The jury was also presented with a spreadsheet produced by Detroit Diesel showing the serial numbers for some 11,819 engines that it manufactured and that were used by Fitzgerald in its glider tractors. (Pf. Ex. 16). With one exception relating to a marine engines, all of the engines on the spreadsheet were Series 60, Class 8 engines, meaning they were built for use in a highway tractor. (Doc. No. 205 at 86 (Bresaw)).

Notwithstanding this and other evidence in the form of both testimony and documents, the Government insists there was no (years 2015 to 2017) – or insufficient (years 2012 to 2014) – evidence[7] showing that Fitzgerald met the safe harbor provision because it (1) erroneously relied on MSRP as a proxy for "retail price"; and (2) failed to show that the engines it purchased were not in a truck originally sold to a municipality, a non-profit organization, a foreign company, or otherwise exempt from tax. Neither argument is persuasive.

As to the first point, the Government argues that "[t]he meaning of 'retail price' as set forth in § 4052(f) is a question of law to be determined by the Court. It is not a fact question for the jury."

---

[7] The evidence at trial focused on the 2012 to 2014 tax years, and little evidence was presented about the 2015 to 2017 tax years. Nevertheless, the evidence was clear that Fitzgerald's practice did not change during those years – it was purchasing engines from wrecked tractors and placing them in gliders.

13

(Doc. No. 198-1 at 9). After making this broad pronouncement, the Government never says what "retail price" means as a matter of law perhaps because "the excise tax and the safe harbor" do not define "retail price of a comparable new article, [n]or has the IRS promulgated any implementing regulations defining th[is] term[.]" Schneider, 11 F.4th at 551. In the absence of such a definition, Schneider teaches that "'retail price' reflects the amount at which an article is sold in individual, arms-length transactions to end consumers on the open market." Id. at 559 (citing Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1480 (Fed. Cir. 1997). This is precisely what the jury was instructed: "'[r]etail price' is the price that a new highway tractor is offered to a consumer or end-user in an arms-length transaction, usually an individual purchaser or small business, in the open market from a dealer ready for use," that it did "not include any federal, state, or local taxes." (Doc No. 192 at 37). Tellingly, the Government did not object to this instruction so its argument fails for that reason as well. See, Howe v. City of Akron, 723 F.3d 651, 661 (6th Cir. 2013) (noting that a party's failure to object specifically to a jury instructions constitutes waiver, "even if the party had raised the issue in its trial brief and even raised it 'obliquely in written and oral objections to jury instructions'"); United States v. Newsom, 452 F.3d 593, 607 (6th Cir. 2006) (finding that party waived any challenge when he failed to object to jury instructions).

As to the second point, the Government argues that Fitzgerald did not prove that all of its glider tractors were built from wrecked tractors that were previously taxed. This is because there was at least some proof that Fitzgerald purchased engines from A&A Truck Parts that sometimes salvaged wrecked municipal tractors, and Fitzgerald may have purchased an engine or two from trucks that had been originally shipped to Mexico or Canada. On this issue, the jury was instructed:

A highway tractor would have been taxable when it was first manufactured if the

14

original highway tractor in combination with a trailer or semitrailer had a gross vehicle weight of 33,000 pounds or more. However, not all sales necessarily are taxable.

Tractors sold to state and local governments, including municipalities, are not subject to tax, as well as sales to certain tax-exempt organizations and sales made outside of the United States.

Fitzgerald is not required to show that the excise tax was actually paid or that the actual sale was subject to the tax, only that the repaired article was taxable when new.

(Doc. No. 192 at 40-41). The jury was also instructed:

[A]lthough there are over 12,000 separate tractors at issues, it is up to you to decide whether the 75 percent test was met for each tractor or collectively for all tractors. You are free to decide that the evidence supports Fitzgerald's contention that all of its repairs met the 75 percent test, just as you are free to decide that the evidence supports the Government's contention that none of the repairs met the 75 percent safe harbor test. Likewise, you are free to decide that Fitzgerald only met the 75 percent test for some of the repairs. In other words, you must determine whether Fitzgerald proved for all, some, or none of the highway tractors it sold, that the cost of repair did not exceed 75 percent of the retail price of a comparable new highway tractor by a preponderance of the evidence.

(Id. at 39). Based upon these instructions, the jury could have found that some of the engines Fitzgerald rebuilt were not taxable when new, but it chose not to do so, as was its prerogative based upon the evidence.

Regardless, the instruction given to the jury was more favorable to the Government than it should have been. This is because, as this Court has previously held:

The statute requires that the tractor be "taxable," not that it was "taxed." Specifically, it requires that the article "would be, if new taxable" but "when new was not taxable." 26 U.S.C. § 4052(f). Had Congress meant taxed as opposed to taxable, it could and should have said so. See Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (citation omitted) ("The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.' "). "Taxable" means "subject to being taxed: making one liable to taxation." https://www.merriam-webster.com/legal/taxable; accord Am. Bankers Ins. Co. of Fla. v. United States, 265 F. Supp. 67, 73 (S.D. Fla.

15

1967).

How is "the article" subject to being taxed? The statute says it must "be taxable under section 4051 ... or the corresponding provision of prior law[.]" 26 U.S.C. § 4052(f)(2). Section 4051, in turn, imposes a 12% excise tax on a number of articles, including "[t]ractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer," so long as it weighs more than 33,000 pounds. 26 U.S.C. § 4051(a)(1), (2). The exported/local government/nonprofit and blood collector exceptions on which the Government relies are found in an entirely different section of the tax code, specifically Section 4221(a).

Fitzgerald II, 2023 WL 3195470, at *5 (M.D. Tenn. May 2, 2023).

The evidence was undisputed that Class 8 engines are the "heart and soul" of a tractor "chiefly used for highway transportation in combination with a trailer" that weighs more than 33,000 pounds. As such, the Class 8 engines that Fitzgerald harvested came from a tractor that was subject to taxation when new. That there may have been some exemptions under a different provision of the Tax Code for trucks sold to municipalities or non-profits does not change that fact.

For all of these reasons, the Government's sufficiency of the evidence argument fails.

## C. Parts Versus Article

As noted at the outset, the Safe Harbor provides that "[a]n article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article" so long as "the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article." 26 U.S.C. 4052(a). Section 4051, in turn, defines "article" as including an "automobile truck chassis"; "automobile truck bodies"; a "truck trailer and semitrailer chassis"; a "truck trailer and semitrailer bodies"; and "tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer." Id. § 4051(a)(1). Because Fitzgerald repaired engines and not tractors, the Government argues that

16

Fitzgerald is not entitled to the Safe Harbor provision as a matter of law.

In advancing its argument, the Government asserts that <u>Schneider</u> proves the point.[8]  There, unlike here, Schneider National Leasing owned the fleet of tractors on which the repairs and modifications were made.  Fair enough, but the Seventh Circuit concluded that there was a "broad sweep" to the phrase "repairs or modifications," that "can be extensive and substantial, and yet still qualify for the safe harbor if they satisfy the 75% test."  <u>Schneider</u>, 11 F.4th at 555.  (7th Cir. 2021).  "A tractor, for example, might sustain major damage in a head-on collision and require a new engine and cab (perhaps bundled in a powered glider kit) to be restored to working condition. [Section] 4052(f)(1) confirms that such a large-scale 'repair' can qualify for the safe harbor so long as the cost does not exceed the 75% limit."  <u>Id.</u>

"[T]he reality of what Schneider's refurbishment process looked like [was this]: a used tractor was dismantled, a few parts were recovered and combined with ones from a new glider kit, and any components left behind were scrapped."  <u>Id.</u> at 556.  The reality of what Fitzgerald did (at least later on when it did not buy the entire wrecked tractor) was this: a used tractor was rendered inoperable

---

[8]  The Government also relies on <u>Boise Nat. Leasing, Inc. v. United States</u>, 389 F.2d 633 (9th Cir. 1968) and <u>Ruan Fin. Corp. v. United States</u>, 765 F. Supp. 985 (S.D. Iowa 1990).  <u>Boise</u> dealt with the dismantling of trucks that "had as its very purpose the permanent severance from the old truck structures and entities of some of the major components thereof and the incorporation of them as elements in other structures which were to be assembled." 389 F.2d at 636.  As such, the imposition of a excise tax on the new trucks was lawful.  In <u>Ruan</u>, the company "disassembled the tractors and, on an individual basis, cleaned or replaced worn or damaged parts[,] replaced engines on the vast majority of the tractors," and performed "extensive cosmetic work" where appropriate. <u>Ruan</u>, 765 F. Supp. at 988.  The question in <u>Ruan</u> (which could not be decided on summary judgment) was whether the company manufactured a new truck.

As interesting as both <u>Boise</u> and <u>Ruan</u> may be, neither is helpful because both were decided before the Safe Harbor provision was enacted.  Indeed, on appeal, the Eighth Circuit in <u>Ruan</u> noted that, had the Safe Harbor provision been in effect, resolution would be "quite straightforward" because that provision allows "reconditioning that results in an article worth less than 75 percent of the price of a new truck."  <u>Ruan Fin. Corp. v. United States,</u> 976 F.2d 452, 454 (8th Cir. 1992).

when the engine (and perhaps transmission) was removed, this was combined with a glider kit, and whatever remained was scrapped.

It appears to be the Government's position that, had Fitzgerald continued its earlier practice of buying an entire wrecked tractor, removing the engine therefrom, and coupling it with a glider kit, then the safe harbor would be met even though Fitzgerald ditched everything but the engine from the tractor. This is because Fitzgerald owned "the article," i.e. the tractor. However, given the reality of what Fitzgerald was doing, this exalts form over substance and is really a distinction without a meaningful difference. A different conclusion might be appropriate if there was even a shred of evidence to suggest that the wrecked and scrapped tractor (on any part thereof) from which the engine was removed was also refurbished. There was none. Instead, there was always only one "article," the "heart and soul" and unquestionably the most costly component of which was removed to create a glider tractor that was less than 75% of a new tractor.

The Government is not entitled to judgment as a matter of law on the grounds that Fitzgerald did not repair an "article."

**D. Exclusion of Dr. Li's Testimony**

At the conclusion of a Daubert hearing, the Court ruled that Dr. Li would not be allowed to testify as an expert witness. Among other things, the Court observed:

> Throughout his testimony today and many mentions in his written report, his goal is to say that plaintiff's claims and representations aren't truthful. And that, to a large extent, explains why he can identify no standards in the economic field to support his opinions.
>
> Daubert requires much more than a witness come in with a PhD, with an impressive work history, and simply give opinions because he says so. Indeed, that kind of analysis has been rejected by many courts. What he requires and what I was looking for from Dr. Li is some type of economic principles, accepted within the field, that

18

he brought to bear in coming to his opinions and then let cross-examination and the wisdom of the jury, based upon the law that the Court will provide the jury, to determine what weight to give to it.

But his inability to identify persuasively or credibly any type of economic principles he applied regretfully leads the Court to conclude that he's simply not satisfying the standard and I will say the low bar in Daubert for the Court to recognize him as an expert under 702.

At the pretrial conference . . . , I identified the first part of this trial as the safe harbor analysis. Reading Dr. Li's written report, listening to his testimony here today and then analyzing the safe harbor analysis statute, the Court simply cannot find anything in his report that's going to be relevant or based upon reliable standards that will go – that will be helpful to the jury on the issue of the cost of repair or to modify an article that is less than 75 percent of the retail price of a comparable new article. Nothing he says is going to help the jury make a determination on whether or not the repaired or modified article, if new, is taxable under Section 4051. And nothing in his report and his testimony will help the jury determine was the original article not taxable for the purpose of Section 4051 or another provision. Without that kind of analysis supported by economic principles that have been accepted, even if Dr. Li meets this standard of qualifications based on his doctorate and work experience, the Court finds him lacking on the test of relevancy and reliability.

(Doc. No. 182 at 120-22).

The Government insists the exclusion of Dr. Li was error warranting a new trial because Fitzgerald "did not dispute Dr. Li's qualification as an expert"; "Dr. Li's analysis of the records went directly to [Fitzgerald's] credibility"; and "[t]he Court's gratuitous attacks upon the veracity and credibility of both Dr. Li and counsel for the United States were without reason or support" and "[a]s such, the court had no basis for its attack upon the reliability of Dr. Li's proposed testimony or his expert report." (Doc. No. 198-1 at 13, 15).

Whether Fitzgerald agreed that Dr. Li qualified as an expert is beside the point. <u>Daubert</u> and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999) "placed the district courts in the role of 'gatekeeper,' charging them with evaluating the relevance and reliability of proffered expert

19

testimony with heightened care." Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 294-95 (6th Cir. 2007). "[T]he Supreme Court also recognized that implicit in the rule is a district court's gatekeeping responsibility, 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" In re Se. Milk Antitrust Litig., 739 F.3d 262, 276 (6th Cir. 2014) (quoting Daubert, 509 U.S. at 597).

"Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other," requiring a trial court to "consider whether the reasoning or methodology underlying the testimony is scientifically valid." Best v. Lowe's Home Centers, Inc., 563 F.3d 171, 176 (6th Cir. 2009). "There is no 'definitive checklist or test' for striking this balance, but the Supreme Court in Daubert did identify four factors that normally bear on the inquiry:

> whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field."

United States v. LaVictor, 848 F.3d 428, 441 (6th Cir. 2017) (quoting United States v. Semrau, 693 F.3d 510, 520 (6th Cir. 2012)). The Court analyzed each of those factors in deciding to exclude Dr. Li.

To this day, Dr. Li's reasoning and/or methodology has yet to be cogently explained. He began his Daubert hearing testimony by stating that he was an expert in the "transactional analysis field," (Doc. No 182 at 73), even though that phraseology was not used in his expert report. (Doc. No. 182 at 73). Next, during a colloquy with the Court, Government's counsel suggested that "there is a concept that is recognized within the courts of testing economic substance," and Dr. Li then

20

claimed that is what he did in relation to the samples he "tested." (Id. at 81). Later, during cross-examination, Dr. Li stated that he conducted a "forensic accounting analysis," even though he admitted he was not a forensic accountant. (Id. at 82). Finally, in its brief seeking a new trial, the Government contends that Dr. Li "was offered as an expert in economics and data analysis." (Doc. No. 19801 at 13).

As a part of his "method," Dr. Li performed text searches utilizing software. His "theory" – based on the premise provided to him by the Government – was that the highway tractors in the universe he was considering had to have been taxed. Upon review, Dr. Li could not make that determination because the records supplied by Fitzgerald did not contain the titles for the tractors. (Id. at 85). Later, Dr. Li attempted to retreat from that position, claiming that his instruction from the Government was that "ownership was required," whether that be "reflected in the title or maybe purchase receipt[s]." (Id. at 89).

Whatever his methodology, it was not the "testing of economic substance" as argued by the Government. "The economic substance doctrine allows courts to enforce the legislative purpose of the [Tax] Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality." Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 543 (5th Cir. 2009) (citing Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353–54 (Fed. Cir. 2006)). "The doctrine permits the IRS to 'ignore for tax purposes any sham transaction, *i.e.*, a transaction designed to create tax benefits rather than to serve a legitimate business purpose.'" Est. of Kechijian v. Comm'r of Internal Revenue, 962 F.3d 800, 808 (4th Cir. 2020) (quoting Hines v. United States, 912 F.2d 736, 739 (4th Cir. 1990)). In essence, "[t]he economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit,

21

which is legitimate, and creating a transaction to generate a tax benefit, which is illegitimate." Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1375 (Fed. Cir. 2010) (citing Coltec, 454 F.3d at 1357). "Such transactions include those that have no business purpose beyond reducing or avoiding taxes, regardless of whether the taxpayer's subjective motivation was tax avoidance." Id.

Fitzgerald's placing repaired engines into glider kits and then reselling the combined unit as a glider tractor was not a "sham transaction" serving "no legitimate purpose." Whether, in doing so, Fitzgerald met the safe harbor provision is a question that Dr. Li did not and could not address utilizing his expertise as an economist. The Government does not, and cannot, argue otherwise.

Regardless, the exclusion of Dr. Li was harmless evidence given the evidence presented at trial. Dr. Li's opinion was essentially that Fitzgerald (1) bought engines that it repaired and placed into glider kits and (2) did not have titles to the tractors from which the engines came. Beyond simply looking at documents, the Government has not shown how Dr. Li's education, training and/or experience led him to these less-than-startling conclusions that were admitted to by Fitzgerald's own witnesses.

Finally, the Court's did not make gratuitous comments or render such opinions in relation to Dr. Li. Those comments were based upon Dr. Li's report and his vacillating and wabbling answers to this Court's questions.

A new trial based upon the exclusion of Dr. Li will not be granted.

## E. Limitation on MacKay's Testimony

In an underdeveloped argument covering less than a page, the Government next claims that this Court erred in limiting MacKay's opinion that Fitzgerald's glider tractors sold for more than 75% of a comparable new tractor. The Government argues that it was "an abuse of discretion" for

22

the Court to order (1) "on the eve of trial, the production of communications with the dealer from whom [Mr. MacKay] had obtained comparable sales data"; and (2) "the revision of Mr. MacKay's expert report and the scope of his testimony when the Court did not treat [Fitzgerald] the same." (Doc. No. 198-1 at 16).

"An expert is free to give a bottom line, provided that the underlying data and reasoning are available on demand," Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002), and there was nothing unique about the Court requiring Mackay to provide underlying data. Besides, whatever MacKay was required to produce in anticipation of trial, has no bearing on the issue of whether MacKay's testimony was wrongfully limited at trial as argued by the Government.

As for requiring that MacKay's report be revised, the Court does not understand how Fitzgerald was treated any differently because Fitzgerald did not call an expert witness so there was no expert report to revise. In any event, and for at least two reasons, it was not an abuse of discretion for the Court to require MacKay to revise his report. First, this Court's Local Rule 39.01(c)(5)(E) requires than an expert's "written statement" contain and be limited to "every material fact and opinion" as to which he or she is going to testify. Second, assuming it is the proper basis for expert opinion, MacKay's proposed testimony about the "general background and history of the glider tractor industry" (Doc. No. 198-1 at 16) had no relevance to the issue of whether Fitzgerald was entitled to the safe harbor provision. See, In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528 (6th Cir. 2008) (observing that, among other things, an expert's testimony under Rule 702 "must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue").

A new trial is not warranted based upon the supposed limitation of MacKay's testimony.

**F. Comments and Testimony About Prior Audits**

The Government argues that the comments and testimony about prior audits was irrelevant and highly prejudicial because the issue of equitable estoppel was scheduled to be addressed in the second phase of the trial, if necessary. It goes on to assert that Fitzgerald "in effect presented an equitable case without any instructions to the jury on the heavy burden it faced with an equitable estoppel claim." (Doc. No. 198-1 at 20).

As a preliminary matter, the Government has waived this claim. After Fitzgerald argued in its opening statement that "the IRS audited Fitzgerald consistently, starting in 1991, and found that Fitzgerald had met the safe harbor," (Doc. No. 205 at 123), the Government did not object, even though Fitzgerald repeated the assertion throughout its opening statement. To the contrary, the Government joyfully jumped on the bandwagon, asserting that, "[t]he IRS never told Mr. Fitzgerald, 'what you're doing is fine.' They never did that. The IRS, you'll see, continued to assess Mr. Fitzgerald time and time again." (Id. at 29). Thereafter, when Tommy Fitzgerald – the very first witness – testified he had been subjected to "four previous audit" and that the IRS essentially agreed with him that what he was doing was fine, (Id. at 152), the Government did not object. Nor did it object when Alan Wainscott testified that his employer (Thompson Trucks) had been audited four times by the IRS in relation to gliders sourced from Fitzgerald and no issue was found during the audits. (Doc. No. 206 at 165-66). And so on, through closing arguments wherein the Government argued that "those audits had determined that Mr. – the taxpayer here, Fitzgerald, owed the tax," and that Fitzgerald managed to "fool" an appeals officer. (Doc. No. 208 at 190-91, 193). Further, regarding the audits, the Government argued, "not once did the examining agent agree with Fitzgerald's position. Not once did he say, 'Oh, you're right.' Not once. There's no evidence. It's

24

just counsel's argument saying the IRS agreed with [Fitzgerald]. They didn't." (Id. at 199).

The Court recognizes that some view objecting during opening statements or closing arguments to be bad form. However, the failure to object means that the issue is not preserved. See, Smego v. Mitchell, 645 F. App'x 523, 527 (7th Cir. 2016) (collecting cases); State Auto Prop. & Cas. Co. v. Matty, 438 F. App'x 820, 822 (11th Cir. 2011); Rosemann v. Roto-Die, Inc., 377 F.3d 897, 902 (8th Cir. 2004). Moreover, even if the Government thought it bad form to object during opening, it could have requested a sidebar at the close of opening statements to address the matter at that time. At a minimum, the Government should have timely, specifically, and clearly objected during trial when the audits were raised. The Court does not recall the Government doing so.[9]

Regardless, evidence can go to more than one issue and the evidence about prior audits went not only to the equitable estoppel claim, but also Fitzgerald's thinking. Throughout trial, the Government painted Fitzgerald as a recalcitrant, unwilling to do what it was told. Prior approval of Fitzgerald's practices by the IRS goes not only to that issue but also to Fitzgerald's explanation of why it continued to utilize the same business practices after the audits. See Trucks, Inc. v. United States, 234 F.3d 1340, 1342 (11th Cir. 2000) (stating, in tax refund suit, that "evidence about the state of mind of the company's president, who made many of the decisions at issue here, is

---

[9] The closest the Government came was during Tommy Fitzgerald's testimony when it asserted that the parties agreed to bifurcate the case and would "not go into the estoppel area as to what the IRS" allegedly told Fitzgerald. (Doc. No. 205 at 160). By then, according to the Court's count, the jury had heard about Fitzgerald being audited at least twenty times. This is hardly timely.

Moreover, in reply to Fitzgerald's argument that the issue is waived, the Government does not argue to the contrary, let alone point to where in the record it preserved the issue. Instead, it argues that the "prejudicial testimony turned the trial into a one-sided trial of the IRS based on an ill-defined and unproven estoppel claim." (Doc. No. 216 at 5).

25

considered direct evidence as to the reasonableness of h[is] decisions, and will not be seen as merely self-serving statements").

A new trial will not be granted based upon the jury hearing that Fitzgerald had been repeatedly audited by the IRS in the past.

## G. Exclusion of Exhibits

Finally, the Government complains that this Court improperly excluded four exhibits: Government's Exhibits 50, 51, 102 and 234. However, the decision of whether to allow the introduction of specific exhibits is a matter of discretion, United States v. Nixon, 694 F.3d 623, 634 (6th Cir. 2012), one which the Government has not shown was abused in this case.

Exhibit 50 was an email and invoice from Armando Fuentes, and Exhibit 51 was an invoice from Tractorfacciones, both of which the Government sought to introduce to impeach Tommy Fitzgerald's testimony that he only bought engines from salvage yards in the United States. At first, the Government sought to introduce the documents through Tommy Fitzgerald, but he had never seen the documents before. Next, the Government sought to introduce the documents through Michael Aaron, a former Fitzgerald employee called by the Government, but he did not recognized them either. Accordingly, the documents were excluded for lack of foundation. The Government now argues this was error because the documents were admissible as business records or a party admission. These arguments fail for three reasons.

First, the arguments are new and are therefore waived. See United States v. Sadler, 24 F.4th 515, 562 (6th Cir. 2022) (stating that plain error review applies where an objection is raised that is different from the one presented at trial). Second, the business records exception to the hearsay rule is only "available if the evidence to be introduced was (1) made in the course of a regularly

conducted business activity; (2) kept in the regular course of [ ] business; (3) a result of a 'regular practice of the business' to create the documents; and (4) 'made by a person with knowledge of the transaction or from information transmitted by a person with knowledge," United States v. Laster, 258 F.3d 525, 529 (6th Cir. 2001) (citation omitted), none of which was established by the Government through Fitzgerald or Aaron. Third, "[s]tatements by a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, are not hearsay," but " the party seeking admission 'bears the burden of establishing the proper foundation for the admissibility of the statements,'" Thompson v. City of Lansing, 410 F. App'x 922, 930 (6th Cir. 2011) (citation omitted), which, again, the Government did not do.

Exhibit 102 was an email from a potential customer (Chuck Clark) to a Fitzgerald sales representative (Jim Bourke), complaining that the price Fitzgerald quoted for a Peterbilt glider was comparable to the price of a new Freightliner. When asked the relevance, the Government argued that it tended to show that Fitzgerald's reliance on MSRP as a proxy for comparison was baseless. The Court denied admission of Exhibit 102 because it was cumulative to plenty of other evidence about the propriety of Fitzgerald's use of MSRP as a benchmark. The Government does not even address the cumulative nature of this evidence in its Motion for a New Trial. Regardless, the Court finds no error. See Jones v. Wiseman, 838 F. App'x 942, 949 (6th Cir. 2020) ("[W]hile Rule 403 places a thumb on the scale in favor of admission of relevant evidence by requiring that the probative value of the evidence be substantially outweighed a listed danger, the rule ultimately calls for a weighing. And the upshot is that evidence that is only slightly probative is more susceptible to exclusion under rule 403.").

Lastly, Exhibit 234 was an email from Bresaw to Jamie Cooke attaching correspondence

from Larry Hyatt, Fitzgerald's former accountant. That correspondence dealt with potential settlement of the potential penalty during the protest of an audit and was therefore potentially inadmissible under Federal Rules of Evidence 408. However, the Court ultimately excluded the exhibit under Rule 401 as not relevant and likely to confuse issues because the IRS conceded the audit at issue.

Without addressing this Court's reason for excluding Exhibit 234, the Government now argues that it was admissible as a party admission and/or a business record. Even if that is true, the argument is waived because it was not raised at trial. In any event, and as previously noted, those exceptions to the hearsay rule require that an appropriate foundation be laid which the Government did not even attempt to do.

The Government is not entitled to a new trial based upon the allegedly erroneous exclusion of Exhibits 50, 51, 102 and 234.

## IV.  Conclusion

On the basis of the foregoing, the Government's Motion for Judgment as a Matter of Law or New Trial (Doc. No. 198) will be denied. Its Motion to Redact (Doc. No. 195) will also be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

28